1

2

3

4

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DWAYNE SULLIVAN,

11              Petitioner,                    No. CIV S-02-1148 MCE KJM P

12        vs.

13   SCOTT M. KERNAN, Acting Warden,          FINDINGS & RECOMMENDATIONS
     California State Prison - Sacramento,
14   and JEANNE S. WOODFORD, Director
     California Department of Corrections,
15
                Respondents.
16   _____/

17              Petitioner is a state prisoner, represented by counsel, proceeding with an

18   application for a writ of habeas corpus under 28 U.S.C. § 2254.  Petitioner challenges his 1999

19   conviction on charges of second degree robbery (1 count) and second degree attempted robbery

20   (2 counts), as well as various sentencing allegations.  Based on the conviction and sentencing

21   allegations, the trial court sentenced petitioner to an indeterminate 75 years to life plus 17 years

22   determinate term of imprisonment.  He seeks relief on the grounds that: (1) his Sixth and

23   Fourteenth Amendment rights to a unanimous jury were violated by a jury instruction; (2) his

24   rights under the Fifth and Sixth Amendments were violated by the trial court's denial of a timely

25   pretrial motion for a lineup; and (3) he was denied effective assistance of counsel by his appellate

26   counsel's failure to raise the denial of the pretrial lineup motion as an issue on direct appeal.

1

1    I. <u>Background</u>[1]

2          On May 13, 1999, an amended information was filed in Sacramento County

3    Superior Court as case number 98F10337, charging petitioner Dwayne Anthony Sullivan as

4    follows: in Counts One and Two, with separate violations of California Penal Code section 211

5    (robbery); and in counts three and four, with separate violations of sections 664/211 (attempted

6    robbery).  The information also contained a number of allegations relevant to the offenses and

7    petitioner's prior convictions.  CT 164-169.[2]

8          On May 25, 1999, petitioner's jury trial began.  CT 201.  On June 8, 1999, the

9    jury found petitioner guilty of the offenses charged in Counts Two through Four (the "Dairy

10   Queen robbery") and found the allegations related to those counts to be true.  CT 296-298, 304.

11   The court declared a mistrial on Count One (the "Burger King robbery") after the jury declared it

12   was deadlocked on that count.  CT 304.  In a bifurcated proceeding held on August 12, 1999, the

13   court found the prior conviction and prison term allegations to be true.  CT 9.

14         The following are historical facts underlying the convictions on Counts Two

15   through Four.  At about 6 p.m. on November 30, 1998, a man holding a tire iron entered the

16   Dairy Queen on Folsom Boulevard at Notre Dame in Sacramento.  RT 84-86, 103, 127-129, 147-

17   148.  The man told Jeanine Moore, the clerk at the counter, to give him the money from the

18   register or he would hit her over the head.[3]  RT 85, 87.  Moore told petitioner she did not have

19   the key and went to ask the manager to open the register.  RT 87-88.  Petitioner then approached

20

21         [1] Petitioner has not provided the court with a statement of historical facts in either the
     Amended Petition or the Traverse, and the sole California appellate court opinion in the case
22   does not contain a summary of historical facts.  <u>See</u> Lodged Doc. 2.  Many of the historical and
     procedural facts in this section have been adopted from respondent's Answer.  <u>See</u> Docket No.
23   28.  This court has independently established that the facts contained in this section are fully
     supported by the record.
24
           [2] CT stands for the Clerk's Transcript, which has been lodged with this court. RT stands
25   for the Reporter's Transcript, which also has been lodged with the court.

26         [3] Moore identified petitioner as the robber.  RT 86-87.

2

1  two customers, Anna and Clarence Schroeder, who were 69 and 71 years old, respectively.

2  RT 88, 127, 129, 147, 150.  Petitioner asked for Mr. Schroeder's wallet, but Mr. Schroeder

3  refused.  RT 129, 150.  Petitioner then asked for Mrs. Schroeder's purse.  RT 130, 150.  After

4  saying he would hurt her if she refused, petitioner grabbed the purse and ran out of the door.  RT

5  129-130, 150.  The purse contained, among other things, $18 in cash and a rosary.  RT 135.  Mr.

6  Schroeder followed petitioner, but lost sight of him as petitioner ran north on Notre Dame.  RT

7  151.

8       The suspect was described to police as an African American man, in his mid 30s,

9  with a mustache, and wearing a black or dark cap, a black and green flannel shirt and black pants.

10  RT 103.  Approximately 15 minutes after the robbery, petitioner was stopped by police a few

11  blocks from the scene at Notre Dame and Bennington.  RT 104-105.  Petitioner is an African

12  American, mid 30s, with a mustache, and he was wearing a brown knit cap, brown pants and a

13  green and gray flannel shirt at the time he was detained.  RT 104, 161.  Eighteen dollars in cash

14  and Mrs. Schroeder's rosary were found in petitioner's clothes.  RT 165, 200-201.  In petitioner's

15  car, which was parked near the location where petitioner was detained, officers found Mrs.

16  Schroeder's purse on the passenger's floor and a tire iron on the backseat.  RT 109, 161-163,

17  181.  The three victims were taken to the location where petitioner was detained, and they

18  identified petitioner as the man who committed the robbery at the Dairy Queen.  CT 64-67.

19       On September 1, 1999, the trial court denied probation and sentenced petitioner to

20  state prison for an aggregated term of 92 years.  CT 10, 345.  On the same day, petitioner filed a

21  timely notice of appeal.  CT 346.  On July 27, 2000, petitioner filed his opening brief in the

22  California Court of Appeal, Third Appellate District, case number C033604, arguing that the trial

23  court's instruction of the jury with CALJIC No. 17.41.1 impinged upon his Sixth and Fourteenth

24  Amendment rights to a unanimous jury and a jury free to use its power of nullification.  Lodged

25  Doc. 1.  On January 17, 2001, the Court of Appeal filed an opinion in which it affirmed the

26  judgment.  Lodged Doc. 2.  On March 28, 2001, the California Supreme Court, in case number

3

1    S095279, denied petitioner's petition for review that had raised a single issue, that of the jury's

2    instruction with CALJIC 17.41.1.  Lodged Docs. 3, 4.

3              On May 28, 2002, petitioner filed a petition for a writ of habeas corpus in this

4    court.  On October 25, 2002, this court ordered the Federal Defender appointed to represent

5    petitioner.  On April 29, 2003, this court granted petitioner's motion for a stay of proceedings

6    and directed that the matter be held in abeyance pending the exhaustion of state remedies.  On

7    April 13, 2005, the California Supreme Court denied petitioner's state exhaustion petition in case

8    number S128745.  Lodged Docs. 5, 6.

9              On May 16, 2005, petitioner filed an amended petition for a writ of habeas corpus

10   in this court.  Respondent filed an answer to the amended petition on August 30, 2005.

11   Petitioner, represented by new counsel, filed a traverse on June 1, 2007.

12   II.  <u>Standards for Habeas Corpus Relief</u>

13             An application for a writ of habeas corpus by a person in custody under a

14   judgment of a state court can be granted only for violations of the Constitution or laws of the

15   United States.  28 U.S.C. § 2254(a).  Also, federal habeas corpus relief is not available for any

16   claim decided on the merits in state court proceedings unless the state court's adjudication of the

17   claim:

18            (1) resulted in a decision that was contrary to, or involved an
              unreasonable application of, clearly established federal law, as
19            determined by the Supreme Court of the United States; or

20            (2) resulted in a decision that was based on an unreasonable
              determination of the facts in light of the evidence presented in the
21            State court proceeding.

22   28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").[4]  It is the habeas

23   petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  <u>See</u>

24   <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002).

25   _____

26        [4]  Title 28 U.S.C. § 2254(d) establishes a precondition to federal habeas relief, not
     grounds for entitlement to habeas relief.  <u>Fry v. Pliler</u>, 551 U.S. 112, 118-19 (2007).

1    The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

2  different.  As the Supreme Court has explained:

3          A federal habeas court may issue the writ under the "contrary to"
           clause if the state court applies a rule different from the governing
4          law set forth in our cases, or if it decides a case differently than we
           have done on a set of materially indistinguishable facts.  The court
5          may grant relief under the "unreasonable application" clause if the
           state court correctly identifies the governing legal principle from
6          our decisions but unreasonably applies it to the facts of the
           particular case.  The focus of the latter inquiry is on whether the
7          state court's application of clearly established federal law is
           objectively unreasonable, and we stressed in Williams [v. Taylor,
8          529 U.S. 362 (2000)] that an unreasonable application is different
           from an incorrect one.

9

10  Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

11  law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

12  fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

13  (2002).

14    The court will look to the last reasoned state court decision in determining

15  whether the law applied to a particular claim by the state courts was contrary to the law set forth

16  in the cases of the United States Supreme Court or whether an unreasonable application of such

17  law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

18  919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

19  of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

20  must perform an independent review of the record to ascertain whether the state court decision

21  was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other

22  words, the court assumes the state court applied the correct law, and analyzes whether the

23  decision of the state court was based on an objectively unreasonable application of that law.

24    "Clearly established" federal law is that determined by the Supreme Court.

25  Arredondo v. Ortiz, 365 F.3d 778, 782-83 (9th Cir. 2004).  At the same time, it is appropriate to

26  look to lower federal court decisions as persuasive authority in determining what law has been

1  "clearly established" and the reasonableness of a particular application of that law.  Duhaime v.

2  Ducharme, 200 F.3d 597, 598 (9th Cir. 1999); Clark v. Murphy, 331 F.3d 1062 (9th Cir. 2003),

3  overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63 (2003); cf. Arredondo, 365 F.3d at

4  782-83 (noting that reliance on Ninth Circuit or other authority outside bounds of Supreme Court

5  precedent is misplaced).

6  III.  Petitioner's Claims[5]

7      A.  Jury Instruction Error

8          Petitioner challenges the giving of CALJIC 17.41.1 to petitioner's jury before it

9  was excused for deliberations:

10         The integrity of a trial requires that jurors, at all times during their
           deliberations, conduct themselves as required by these instructions.
11
12         Accordingly, should it occur that any juror refuses to deliberate, or
           express[es] an intention to disregard the law or to decide the case
           based on penalty or punishment or any other improper basis, it is
13         the obligation of the other jurors to immediately advise the Court
           of that situation.
14

15  RT 411.  Petitioner argues that the giving of this instruction invited a majority of jurors to put

16  undue pressure on a minority, and laid the groundwork for a juror coming forward during

17  deliberations and divulging information regarding a single juror's participation, that prompted

18  the court to engage in unwarranted and excessive intrusion into the deliberations.  Am. Pet.

19  at 3-11.

20         During deliberations, Juror No. 10 brought to the trial court's attention a problem

21  she saw with the deliberations of another juror, whom she felt tended to "over-intellectualize"

22  everything.  RT 427.  When Juror No. 10 sought to continue her account of this unidentified

23

24         [5] In the traverse, petitioner's counsel states several times that the state court's decision
    was based on an unreasonable determination of the facts in light of the evidence presented.  See
25  Traverse at 1, 5, 9.  However, this court has not been able to find anything more than conclusory
    statements on this point.  Therefore, a separate consideration of this petition under the standards
26  of 28 U.S.C. § 2254(d)(2) is not warranted.

6

juror's[6] method of deliberations, the court cut her off with the observation that "different personalities . . . see the evidence in different ways." RT 428.  Juror No. 10 then said the other juror said that "he was willing to compromise . . . sort of make a deal on one count to let the other one slide." RT 428.  Further, Juror No. 10 stated a belief that "[the other juror] wanted us to make a decision because he wanted to go home at lunch, like, us finish [sic]." RT 429.  The trial court told Juror No. 10 that she had "done her duty as far as the jury instructions are concerned" and then had the jury returned to court for a further instruction:

> Ladies and gentlemen, where the deliberations are concerned, . . . you each must decide the case for yourself.  And if you reach a unanimous verdict, so be it.  If you cannot reach a unanimous verdict, then so be it as well.  But each of you must decide the case on your own.
>
> You should not offer to compromise or trade one count for another or in any way attempt to negotiate a verdict.  A verdict has to be what you believe the evidence shows.  And determine whether or not the charges and allegations have been proved against the defendant beyond a reasonable doubt or not.
>
> And as you heard over and over again, if you are satisfied that any or all of them are proved beyond a reasonable doubt and make the appropriate findings, if you are not, then you make the appropriate finding.   You should deliberate and discuss the matter with the other jurors.  And, ultimately, you must decide the case for yourself.  As an individual, if all of you agree, you should reach a verdict.  If you do not, the jury does not have a verdict insofar as some or all of the case is concerned.

RT 430.

After an evening recess, Juror No. 8 asked to speak with the judge and complained that she could not work with Juror No. 1, because that juror continually told the group that he would "cave in" because he "want[ed] to get out of here" by a particular time.  According to Juror No. 8, Juror No. 1 said he wanted to "do this by noon.  Let's negotiate on this." RT 435-440.  Juror No. 8 suggested that the jury foreman was also more interested in

---

[6] Later events suggest that this was Juror No. 1.

1    negotiating a verdict and leaving by noon than in having testimony reread.  RT 440.

2            After Juror No. 8 was excused, Juror No. 10 returned to the courtroom and

3    complained that Juror No. 1 seemed unbalanced, but also believed that he was "so brilliant."

4    RT 443.  Juror No. 10 complained that the jury had reached agreement on some things the day

5    before but Juror No. 1 then changed his mind because he "had dreams."  RT 443.

6            When Juror No. 10 left the courtroom, the judge mused that she had "opened up

7    the thought process of Juror Number One, which this Court is not entitled to inquire into."

8    RT 444.  The court concluded that Juror No. 1 could not be "thrown off the jury because eleven

9    people think one way and he thinks the other."  RT 445.

10           After this, Juror Nos. 2 and 8 entered the courtroom and told the judge they were

11   having some problems with Juror No. 10, who "was intimidating a lot of people on the jury."

12   RT 448.  Juror No. 4 separately told the court that Juror No. 10 "hushes" her but she nevertheless

13   voted her conscience.  RT 450.

14           When the jurors had left, the prosecutor agreed with the judge's decision to ask

15   the jury if it had reached verdicts on any of the counts and observed that "I think we have gone a

16   little bit too far into the jury deliberations process."  RT 452.

17           The court agreed and then said it would not replace any of the jurors.  It then

18   inquired of the jury foreman, who reported that verdicts had been reached on some counts, but

19   even one of those was subject to change.  RT 453-455.  Based on the foreman's belief that the

20   jury could reach consensus on some more of the counts, the court returned the jury for further

21   /////

22   /////

23   /////

24   /////

25   /////

26   /////

1    deliberations.  RT 455-457.  The court instructed the jury:

2         What I want you to do is go back in the jury deliberation room and
          consider everything that you decided thusfar [sic] to determine.
3         First, if you do, in fact, have verdicts as to the items which you
          have already decided, and if you do not have verdicts, as to some
4         or all of the questions that we have posed to you by way of a
          verdict form.  Then the issue is do you each feel that the jury is
5         hopelessly deadlocked, and that it would be impossible to have
          further deliberations of the jury as to those portions of the case
6         where no agreement has been reached.

7    RT 458.

8              When the jury returned, it reported that further deliberations would not produce

9    verdicts on the deadlocked counts, but that it had reached verdicts on counts two, three and four.

10   RT 461-468.

11             As noted, petitioner contends that the giving of CALJIC 17.41.1 as one of the

12   initial jury instructions resulted in an excessive intrusion into the private and secret deliberations

13   of the jury.  Petitioner argues that the intrusion resulted in a denial of petitioner's Sixth and

14   Fourteenth Amendment rights to a trial by jury and to a unanimous jury verdict.  See Am. Pet. at

15   11-12.

16             The Ninth Circuit considered CALJIC 17.41.1 in Brewer v. Hall, 378 F.3d 952,

17   955-57 (9th Cir. 2004), decided after petitioner's conviction and after he filed the original petition

18   in this court.  In Brewer, the court found that regardless of the "constitutional merits" of CALJIC

19   No. 17.41.1, habeas corpus relief was unavailable on the claim that giving the instruction

20   violated due process because there is "no Supreme Court precedent clearly establishing" that use

21   of such an antinullification instruction violates a defendant's constitutional rights.  Id. at 955-56.

22   Here, as in Brewer, petitioner "has pointed to no Supreme Court precedent clearly establishing

23   that CALJIC 17.41.1 – either on its face or as applied to the facts of his case – violated his

24   constitutional rights."  Id. at 957.

25             Petitioner's attempts to distinguish the case at bar from Brewer are not persuasive.

26   First, the assertion that petitioner had a constitutional right to a unanimous jury verdict is

9

1   incorrect, and petitioner's citation to <u>Apodaca v. Oregon</u> for this proposition is in error.  Am. Pet.

2   at 10; Mem. P. & A. in Supp. Traverse at 6.  In <u>Apodaca</u>, in affirming the Oregon Supreme

3   Court's decision to uphold a 10 to 2 non-unanimous verdict, a four justice plurality expressed its

4   view that the right to a unanimous verdict was not part of the Sixth Amendment's right to a jury

5   trial.  <u>Apodaca v. Oregon</u>, 406 U.S. 404, 406, 414 (1972).  Justice Powell concurred in the

6   judgment, finding that while the right to a unanimous verdict was part of the Sixth Amendment

7   right to a jury trial in federal court, this right was not incorporated in the Fourteenth Amendment

8   so as to apply to the states.  <u>See Johnson v. Louisiana</u>, 406 U.S. 366, 376  (1972) (Powell, J.,

9   concurring).  The four dissenters would have reversed the Oregon Supreme Court and found a

10  constitutional right to a unanimous jury verdict applicable to both the federal government and the

11  states.  <u>Apodoca</u>, 406 U.S. at 414-15.  In sum, <u>Apodaca</u> stands for the proposition that there is a

12  Sixth Amendment right to a unanimous verdict in federal, but not in state, criminal trials.

13  <u>Apodaca</u> has never been abrogated.  Whether or not petitioner has a right to a unanimous verdict

14  as a matter of state constitution or state law is irrelevant.  Petitioner cannot distinguish his case

15  from <u>Brewer</u> by pointing to a federal constitutional right that does not exist.

16          Second, the argument of intrusion into jury deliberation, also presented by

17  petitioner, was considered by the Ninth Circuit in <u>Brewer</u>.  <u>See</u> 378 F.3d at 956.  The court

18  recognized the existence, as petitioner's counsel does here, of a number of broad statements in

19  several Supreme Court opinions that jurors should be generally protected from outside influence.

20  <u>See</u> Mem. P. & A. in Supp. Traverse at 6; <u>Brewer</u>, 378 F.3d at 956.  However, the Ninth Circuit

21  concluded that "these cases do not clearly establish that the use of CALJIC 17.41.1 was improper

22  in the circumstances presented [in Brewer's underlying state criminal case]," namely the court's

23  giving CALJIC No. 17.41.1 "repeatedly" to a deadlocked jury when it was probably aware that

24  one juror was considering penalty during the deliberations.  <u>Id</u>. at 956-57.  <u>Brewer</u> is properly read

25  as applicable to a range of situations in which a court is compelled to inquire into jury

26  deliberations when faced with an allegation of jury misconduct.  The court in <u>Brewer</u> recognized

1   that the federal constitutional right to trial by jury does not require absolute and impenetrable

2   secrecy of all aspects of jury deliberations in the face of an allegation of juror misconduct, and

3   does not serve as an absolute bar to jury instructions that might induce jurors to reveal some

4   element of their deliberations.  Id. at 356.  It also noted that while the California Supreme Court in

5   a decision referenced by petitioner, People v. Engelman, 28 Cal.4th 436 (2002), exercised its

6   supervisory powers over lower state courts to direct that CALJIC 17.41.1 should not be given

7   prospectively, that court found no violation of a constitutional dimension occurring as a result of

8   the giving of the instruction.  Brewer, 378 F.3d at 957.

9          In this case, even though the trial court's questioning of jurors appears to have been

10   more extensive than in Brewer, its questions were motivated by its duty to investigate allegations

11   of juror misconduct.  Moreover, unlike the situation in Brewer, the court did not repeat CALJIC

12   No. 17.41.1.  Rather, after the court's inquiry of jurors, it gave two additional supplemental

13   instructions, at different times; in each instruction it urged the jurors to give the verdicts their

14   individual consideration and to return verdicts only if they could do so in good conscience.  RT

15   430, 458.  These instructions, which the jurors are presumed to have followed, properly

16   reaffirmed the right to trial by jury to which petitioner was entitled.

17          The state court's rejection of petitioner's jury instruction claim was not contrary to

18   or an unreasonable application of clearly established federal law and no relief may be granted on

19   this ground.  28 U.S.C. § 2254(d).

20        B.  Denial of Pretrial Motion for a Lineup

21          On March 5, 1999, petitioner's trial counsel filed a motion for a pretrial lineup.

22   CT 21-27.  In that motion, counsel argued that petitioner had a right to compel a pretrial lineup

23   because eyewitness identification was a material issue and there existed a reasonable likelihood of

24   mistaken identification that a lineup would tend to resolve, relying in part on Evans v. Superior

25   Court, 11 Cal. 3d 617 (1974).  CT 26-27.  The motion requested the lineups for both the Burger

26   King and the Dairy Queen robberies.  CT 24.  In Count One, the Burger King robbery, the victim

1   picked out petitioner from a photo lineup.  Id.  In Counts Two, Three and Four, stemming from

2   the robbery at Dairy Queen, petitioner was identified by the three victims in a field show-up.  Id.

3          The prosecution filed its opposition to the motion for a pretrial lineup on March

4   10, 1999.  CT 72.  The opposition asserted that the motion should be denied for two reasons:

5   (1) the motion was untimely, and (2) petitioner failed to demonstrate a reasonable likelihood of

6   mistaken identification that a live lineup would tend to resolve.  CT 74.

7          The trial court held oral argument on the motion on March 16, 1999.  RT 1.

8   Noting that the court had read and considered all the parties' filings on the matter, the judge

9   allowed both counsel an opportunity to further argue the motion.  Id.  After hearing the parties, the

10  court denied the motion, finding that "under the facts of this case . . . the defense has failed to

11  establish a reasonable likelihood of mistaken identification which a live lineup would tend to

12  resolve."[7]  RT 4.

13         In the instant petition, counsel asserts that petitioner's constitutional due process

14  rights were violated by the trial court's denial of a timely pretrial motion for a lineup.  The

15  argument forwarded by counsel is based on two premises.  As to the first premise, counsel

16  correctly points out that the United States Supreme Court has held that some methods employed

17  by police and prosecutors to secure an eyewitness identification may deprive a defendant of due

18  process where the methods are "so unnecessarily suggestive and conducive to irreparable

19  mistaken identification."  See Stovall v. Denno, 388 U.S. 293, 302 (1967), overruled on other

20  grounds by Griffith v. Kentucky, 479 U.S. 314 (1987).  Before deciding whether any relief may be

21  granted under the Stovall line of cases, the court addresses whether petitioner's second premise –

22  reliance on the California Supreme Court's decision in Evans – is misplaced.

23  /////

24

25         [7] Petitioner's counsel has argued that the part of the motion that requested a lineup in the
    Dairy Queen case was overlooked.  Traverse at 8.  To the contrary, even a cursory review of the
    transcript of the March 16, 1999 proceedings supports the conclusion that the trial court carefully
26  considered the merits of the motion for a lineup in regard to both robberies.  See RT 1-5.

12

1       In <u>Evans</u>, the California Supreme Court held that "due process requires in an

2 appropriate case that an accused, upon timely request thereof, be afforded a pretrial lineup in

3 which witnesses to the alleged criminal conduct can participate." 11 Cal. 3d at 625. In finding

4 this ancillary federal due process right, the California Supreme Court relied on several United

5 States Supreme Court cases, including <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), <u>Williams v.</u>

6 <u>Florida</u>, 399 U.S. 78 (1970), and <u>Wardius v. Oregon</u>, 412 U.S. 470 (1973). <u>Evans</u> at 623-625.

7 But unlike <u>Evans</u>, the United States Supreme Court has never held that a criminal defendant has a

8 constitutional right to a pretrial lineup. Furthermore, the Ninth Circuit has explicitly rejected any

9 constitutional dimension to a defendant's request for a pretrial lineup. <u>See</u> <u>United States v.</u>

10 <u>Robertson</u>, 606 F.2d 853, 857-58 (9th Cir. 1979) ("An accused has no absolute or constitutional

11 right to a lineup.").

12       This court may only grant habeas relief for violation of the Constitution or federal

13 law. 28 U.S.C. § 2254(a). Decisions of the California Supreme Court regarding the United States

14 Constitution are not binding on federal courts; thus, only the first premise forwarded by petitioner

15 may be appropriately considered. Additionally, petitioner was not convicted of the charge in the

16 Burger King robbery. Therefore, the proper inquiry for this court is whether the California

17 Supreme Court's summary denial of petitioner's state habeas petition, on the claim that his due

18 process rights were violated by the trial court's denial of a pretrial motion for a lineup as to the

19 Dairy Queen robbery, was either "contrary to, or involved an unreasonable application of" the law

20 established by <u>Stovall</u> and its progeny.

21       Petitioner was subjected to ordinary field identification procedures. The first

22 victim was taken to the location where petitioner had been detained. CT 64. Prior to arriving at

23 the location, the officer explained to her how a field showup would work, including certain

24 admonitions. CT 64-65. Upon arrival, petitioner was taken out of a patrol vehicle. CT 65. The

25 victim, from the back seat of the vehicle she arrived in and at a distance of about 20 feet,

26 identified petitioner as the perpetrator. <u>Id</u>. The second identification by the other two victims

1   occurred under similar conditions, except that petitioner was illuminated with car lights because

2   of the darker conditions at the time.  CT 66-67.  At a distance of about 15 feet, both victims

3   positively identified petitioner as their assailant.  CT 67.

4           An identification procedure is suggestive where the pretrial confrontations are so

5   arranged as to make the resulting identifications virtually inevitable.  Foster v. California, 394

6   U.S. 440, 443 (1969).  One-on-one identifications are suggestive.  See Stovall, 388 U.S. at 302.

7   However, "as Stovall makes clear, the admission of evidence of a showup without more does not

8   violate due process."  Neil v. Biggers, 409 U.S. 188, 198 (1972).  Whether the procedure was so

9   unnecessarily suggestive and conducive to irreparable mistaken identification as to amount to a

10  denial of due process depends on the totality of the circumstances.  See Stovall, 388 U.S. at 302.

11          Considering the totality of the circumstances, the identification procedures

12  employed in petitioner's case did not violate due process.  The Court of Appeals for the Ninth

13  Circuit has held that similar "show-up" identifications – and some even more suggestive – did not

14  raise a substantial likelihood of irreparable misidentification.  United States v. Jones, 84 F.3d

15  1206, 1209 (9th Cir. 1996) (suspect was only civilian on the scene, surrounded by police officers

16  holding up a mask and disguise worn by the perpetrator); United States v. Bagley, 772 F.2d 482,

17  492 (9th Cir. 1985) (suspect seated in police car, handcuffed, surrounded by police); United States

18  v. Kessler, 692 F.2d 584, 58-86 (9th Cir. 1982) (handcuffed suspect surrounded by police

19  officers).

20          In sum, the California Supreme Court's rejection of this claim was not contrary to

21  or an unreasonable application of clearly established federal law.  Relief on this ground is

22  precluded by AEDPA.

23      C.  Ineffective Assistance of Appellate Counsel

24          In examining ineffective assistance of counsel claims, this court employs the

25  familiar two-step Strickland analysis.  Strickland v. Washington, 466 U.S. 668 (1984).  The Ninth

26  Circuit has held that habeas petitions governed by Strickland should, in most instances, be

14

1    analyzed under the "unreasonable application" clause of Section 2254(d). Weighall v. Middle,

2    215 F.3d 1058, 1061-62 (9th Cir. 2000).

3            With the respect to the first step of Strickland, a petitioner must carry the burden to

4    demonstrate that his counsel's performance was so deficient that it "fell below an objective

5    standard of reasonableness." 466 U.S. at 688. The assessment must be made "from the counsel's

6    perspective at the time," so as "to eliminate the distorting effects of hindsight." Id. at 689.

7    Further, there is a "strong presumption that counsel's conduct falls within the wide range of

8    reasonable professional assistance," and hence "[j]udicial scrutiny of counsel's performance must

9    be highly deferential." Id.

10           If petitioner is able to establish his counsel's deficient performance, the court must

11   decide whether that performance resulted in actual prejudice. Id. at 687. The question is whether

12   "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

13   proceeding would have been different. A reasonable probability is probability sufficient to

14   undermine confidence in the outcome." Id. at 694. A reviewing court "need not determine

15   whether counsel's performance was deficient before examining the prejudice suffered by the

16   defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness

17   claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v.

18   Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

19           The right to effective counsel and the Strickland standard extend to appellate

20   counsel. Smith v. Robbins, 528 U.S. 259, 285 (2000); Evitts v. Lucey, 469 U.S. 387, 395 (1985).

21   However, appellate counsel does not have a constitutional obligation to raise every nonfrivolous

22   issue requested by petitioner. Jones v. Barnes, 463 U.S.745, 751 (1983). On this point, the

23   Supreme Court has recognized that "since time beyond memory [experienced advocates] have

24   emphasized the importance of winnowing out weaker arguments on appeal and focusing on one

25   central issue if possible, or at most on a few key issues." Id. at 751-52.

26   /////

1    Petitioner argues he was denied effective assistance of appellate counsel because

2    his appellate counsel did not raise the denial of petitioner's pretrial motion for a lineup as an issue

3    on appeal.  Two issues were raised in petitioner's first appeal:  (1) instructing the jury with

4    CALJIC 17.41.1 violated petitioner's constitutional rights, and (2) petitioner was entitled to

5    additional presentence credit.  See Lodged Doc. 1.  Petitioner alleges that his attorney on appeal

6    considered raising the issue of the court's denial of a lineup, but rejected this claim in favor of

7    pursuing the jury instruction argument.  Am. Pet. at 16.

8    Petitioner's ineffective assistance of appellate counsel claim fails because his

9    appellate attorney was objectively reasonable in deciding to exclude the denial of the pretrial

10   motion for a lineup from the appeal.  As discussed above, a federal constitutional challenge to the

11   denial of the motion for a pretrial lineup was unlikely to succeed.  And an examination of the

12   California courts' jurisprudence after Evans shows that petitioner's claim would not have

13   succeeded on appeal as a matter of state law.

14   The Supreme Court of California made clear in Evans that the determination of

15   whether a timely motion for a pretrial lineup should be granted rests with the broad discretion of

16   the magistrate or trial judge.  Evans, 11 Cal. 3d at 625-26.  The standard of appellate review for

17   Evans issues is abuse of discretion.  See, e.g., People v. Sullivan, 151 Cal. App. 4th 524, 560-61

18   (Cal. App. 1st Dist. 2007).

19   The trial judge in petitioner's case carefully considered the briefs of both parties,

20   allowed additional opportunity for oral argument and made a ruling in regard to the motion for a

21   pretrial lineup for both robberies.  See RT 1-5.  The judge also evaluated the motion under the

22   appropriate legal standard from Evans.  RT 4.  The three victims identified petitioner quickly and

23   without hesitation in the field show-ups.  See CT 65, 67.  The victim's purse was found on the

24   floor of petitioner's car and missing from it were a rosary and $18 in cash.  CT 67; RT 135.

25   Those items were found in petitioner's clothes.  RT 165, 200-201.  Given this record, it is unlikely

26   that the state appellate court would find that the trial judge abused his discretion in denying

16

1  petitioner's <u>Evans</u> motion on the ground that "[she found] under the facts of [the] case that the

2  defense has failed to establish a reasonable likelihood of mistaken identification which a live

3  lineup would tend to resolve."  RT 4.

4           In light of the foregoing, a challenge to the trial court's denial of the motion for a

5  pretrial lineup was not likely to succeed on appeal.  Therefore, appellate counsel's  decision not to

6  include the denial of the pretrial motion for lineup as an issue on appeal was an appropriate

7  exercise of discretion.  The California Supreme Court's decision to deny petitioner relief on the

8  claim of ineffective assistance of appellate counsel was not an unreasonable application of

9  <u>Strickland</u> and this court is precluded from granting relief by the provisions of 28 U.S.C.

10 § 2254(d).

11          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

12 writ of habeas corpus be denied.

13          These findings and recommendations are submitted to the United States District

14 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

15 days after being served with these findings and recommendations, any party may file written

16 objections with the court and serve a copy on all parties.  Such a document should be captioned

17 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

18 shall be served and filed within ten days after service of the objections.  The parties are advised

19 that failure to file objections within the specified time may waive the right to appeal the District

20 Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

21 DATED:  September 16, 2009.

22

23 _____

24 U.S. MAGISTRATE JUDGE

25

26 ar/2 sull1148.157

17